LEVI L. BROWN & others *vs.* RANSOM B. DEAN, administrator.

Berkshire. Sept. 11. — Oct. 18, 1877. ENDICOTT & LORD, JJ., absent.

Under the Gen. Sts. c. 127, § 1, an action of tort against a mill-owner, who obstructs the flow of water in a stream by maintaining his dam at too great a height, to the injury of another mill-owner, survives.

A mill-owner, who partially obstructs the flow of water in a stream from his own mill, is not thereby prevented from maintaining an action against another mill-owner, lower down the same stream, for the injury caused by an additional obstruction in consequence of the latter maintaining his dam at too great a height, whereby the water is set back; and the doctrine of contributory negligence does not apply.

In an action by A., a mill-owner, against B., another mill-owner, lower down the same stream, for maintaining his dam at too great a height, whereby the water was set back, A. offered evidence tending to show that he had the right by deed to discharge the water from his mill through a raceway running through the land of B. into the river below. B. contended that the raceway was a natural channel of the river, which divided at a point above A.'s mill, and formed an island, upon which B.'s mill was situated; that A.'s mill discharged the water into this natural stream on his own land; and that the rights of both parties were to be construed and determined accordingly. *Held*, that B. had no ground of exception to a ruling, based on his theory, that A. had the right to pass the water discharged from his premises into the river below.

No exception lies to the refusal of a judge, at the close of his charge to the jury, to give an instruction which is covered by the instructions already given.

In an action against a mill-owner to recover damages caused by his maintaining his dam at too great a height, whereby the water was set back, the jury returned a verdict with nominal damages for the plaintiff, and a direction that the defendant should reduce his dam to a certain level, which latter the judge ordered to be erased, and, several jurors dissenting from the verdict thus amended, directed them to retire, and, if they agreed, return a sealed verdict in the morning. The jury returned a verdict with substantial damages for the plaintiff. *Held,* that the defendant had no ground of exception.

TORT for the obstruction, from October 5, 1865, to September 1, 1872, of the machinery of the plaintiffs' mills, in Adams, by water set back by a dam built by the defendant's intestate, Horatio N. Dean, lower on the stream. Writ dated March 3, 1875. Trial in the Superior Court, before *Dewey,* J., who allowed a bill of exceptions in substance as follows :

The plaintiffs put in evidence tending to show that their mills and dam were situated on land formerly owned in common by John Bucklin and Benjamin Read, and that, while they so owned it, they built a dam across the Hoosac River, and also erected mills, the raceway from which ran through the adjoining land of Read to the river below; that in 1784 Read conveyed one half of the mills, mill lot and dam, " with the other appurtenances relative to the same," to Benjamin Russell, who the same year became the owner of the other half; and from whom the plaintiffs derived their title by various mesne conveyances; that the adjoining lot, owned by Read, and through which the raceway ran, is that owned by the defendant's intestate ; that the raceway had, since 1784, been used in connection with the mills on their land; and that the dam erected by the defendant's intestate was built over this raceway.

The plaintiffs also put in evidence tending to show that those under whom they claimed had erected mills substantially on the site of their present mills, before the erection of any dam on the premises of the defendant's intestate ; and that the dam complained of was built by him in 1860; that, shortly after this dam was built, there was backwater on the plaintiffs' wheels, as there had never before been ; and the plaintiffs contended that it was caused by the dam.

The defendant contended, and offered evidence tending to show, that the dam erected by his intestate was on a natural

stream, a branch or channel of the Hoosac River, which divided at a point near the plaintiffs' dam, forming an island, on which the mills of the defendant's intestate were situated, and into which natural stream the water from the plaintiffs' mills discharged, on their own land, and that the rights given by the deeds under which the plaintiffs claimed, and also the rights of the defendant, were to be construed and determined accordingly.

It appeared that, after the erection of the mills by the plaintiffs' grantors, and the construction or adoption of their raceway about 1810, a mill and a dam, called the old fulling-mill dam, were erected on premises afterwards owned by the defendant's intestate, and that the title to this mill and dam had been acquired by him before the erection of the dam complained of, which he built at a point on the stream about one and one half rods below the old fulling-mill dam.

There was evidence tending to show that the old fulling-mill dam had a permanent planking which set back the water to the height of a certain overflow or waste-way some rods above; that, thus constructed and used, it did not set back the water upon or otherwise injure the mills above, as they were when it was erected, and that the dam complained of was of no greater height than the permanent planking and overflow or waste-way of the old fulling-mill dam; that the plaintiffs, since the erection of the fulling-mill dam, had materially lowered the stream or raceway at a point between their wheels and the fulling-mill dam, and had also lowered their wheel-pits and wheels; and that no period of twenty consecutive years had elapsed since the erection of the old fulling-mill dam, when the use of the plaintiffs' wheels had not been obstructed by water set back by means of loose planks or flash-boards put on the old fulling-mill dam above its permanent planking, or on some other dam erected by the defendant's intestate, or those under whom he claimed, on the premises owned by him when he built the dam complained of.

There was also evidence tending to show that the water, after leaving the plaintiffs' wheels, had to pass through an archway above the premises of the defendant's intestate, about fifty-six feet long and only fourteen feet wide, and that the quantity of water discharged from the plaintiffs' wheels was so great that it could not be discharged through this archway without being

therein at least two feet in depth, and without setting back
water upon his wheels to at least that amount, when the wheels
are in operation under the ordinary head and gates, and that if
there was a sheer descent at the lower mouth of said archway, it
would not reduce the depth of water in the arch, or on the plain-
tiffs' wheels, and that, if the dam complained of should be en-
tirely taken down, it would not lessen the depth of water in this
archway, or on the plaintiffs' wheels when in ordinary operation,
and that, if the plaintiffs' wheels had been hindered or obstructed
by backwater, such backwater was caused wholly or in part by
the archway being too narrow, and not sufficiently deepened to
pass the volume of water discharged by the plaintiffs' wheels
when in use, without causing backwater therefrom. · There was
no evidence that the defendant's intestate, between October 5,
1865, and September 1, 1872, did any act whatever to his dam
or waterworks, except to use them, as constructed in 1860, for
the use of his tannery.

The defendant asked the judge to instruct the jury that un-
less the defendant's intestate had done something more than to
simply use a dam erected before the time complained of in the
plaintiffs' writ, the cause of action would not survive against his
administrator ; but the judge declined so to rule.

The defendant also asked the judge to instruct the jury that,
if they believed that the backwater on the plaintiffs' wheels was
caused in part by the wrongful acts of the defendant's intestate,
and in part by the lowering of the plaintiffs' wheel-pits, and in
part by the narrowness of the archway, then they had contrib-
uted to their own injury, and could not recover against the de-
fendant; but the judge declined so to instruct the jury.

The judge then gave the jury the following instructions, among
others not now necessary to state : " The proprietor who first
lawfully erects his dam across a stream to create a fall by means
of which he may operate his mill has a right afterwards to main-
tain it against all other proprietors, both above and below him,
and to this extent priority of occupancy gives priority of title.
That is, the first occupant can flow back on the land of others
above his dam, paying flowing damages, and he has a right to
have the water pass off freely from his wheel, and the owner be-
low has no right to flow back on his wheel.

"The defendant contends that the stream or channel, across which the dam was erected, was a branch of the Hoosac River that divided above the plaintiffs' mills. Assuming this is so, the lower proprietor of a mill may maintain a dam, or raise it, so as to use all the unappropriated water-power of the stream ; he may do so, if it causes the water of his pond to set back into the raceway of the mill above, provided it does not obstruct the upper mill-owner's wheel, or otherwise injure his mill. After each party has made an appropriation of the water-power he is entitled to, neither can make any changes which shall injuriously affect the rights of the other. The defendant contends that the backwater arises from other causes than the dam, and from causes for which he is not responsible, namely, that it is occasioned by the greater quantity of water which is discharged upon the plaintiffs' wheels, which fills the wheel-pits and prevents a discharge as formerly, and causes it to set back, or not pass off freely ; that the archway is not sufficient for the large discharge of water now passing off ; that since the appropriation by the defendant's intestate of the water rights below the plaintiffs' dam, the plaintiffs have dug down and lowered their wheels so as to cause the water to set back on the present wheel, when it did not before. If the plaintiffs, in lowering their wheels, digging out their wheel-pit or raceway, or use of greater amount of water beyond what they were authorized by their deed from Read, and, as occupants of the first privilege, have caused the water to obstruct their wheels, or if others than the defendant's intestate, as the builder of the archway, have done it, of course the defendant is not liable for the backwater arising from these causes. The plaintiffs' wheels were not put in till four years ago, and they contend that there was backwater on the old one, and that the volume of water does not block up the archway ; that the clearing out of the raceway has been of stones and dirt falling in. On all these points you will consider the conflicting testimony, and decide what are the facts.

"The defendant also contends that, if you should find that the dam caused the water to set back upon the wheels of the plaintiffs, his intestate did not raise his dam any higher than he had a right to, and his acts were not wrongful. The titles and rights to the tannery and fulling-mill dams had both vested in the de-

fendant's intestate. The fulling-mill title did not pass to Dean till about 1840. It was built about 1811, and the defendant contends that the fulling-mill dam was as high as the present dam, and that the height of the tannery dam was as high; that it had been maintained to that height for such a length of time, and under such circumstances as to give a right forever to keep it as high. In other words, that, by adverse use or possession of twenty years, his intestate and those under whom he claimed had acquired the right. It is important you should clearly understand what is necessary to the acquirement of a title or right in this way. The possession or user must be adverse, peaceable, uninterrupted, with a claim of right notorious and with the knowledge of the other party, and continued in this manner for twenty years ; all these requisites must unite. If the use was permissive, or without a claim of a right, or if the right was claimed, but resisted or interrupted at any time in the twenty successive years, then no right is gained. If, by such an adverse user and possession as the law requires in order that a title or right shall be acquired in this mode, the defendant's intestate had gained the right to maintain his dam as high as it now is, the plaintiffs cannot recover. But if he had not gained it, and, by maintaining it, he caused the water to set back on the plaintiffs' wheels, placed no lower than the owner of the first wheel placed them, or that the plaintiffs, or those under whom they claim, have gained an adverse right in the same way in which, as already said, adverse rights above could be gained, then the defendant is liable for the damage caused by the backwater set back on the wheels by the dam.

" If you find that the backwater on the wheels of the plaintiffs is caused, a part of it, by the wrongful acts of the defendant's intestate, and partly by other causes, as the lowering of the wheel or narrowness of arches, &c., or the increased volume of water discharged by the plaintiffs on the wheel, the defendant is liable only for such portions of the damage as arose from the backwater which his intestate wrongfully caused, and you can only find for the plaintiffs for the amount which, upon the evidence, — the burden being upon the plaintiffs to satisfy you as to the amount, — you are satisfied arose from the wrongful acts of the defendant's intestate, and not from any other cause."

After these instructions, and before the jury retired, the defendant asked the judge to rule that if the old fulling-mill dam, at the height of its permanent boarding, did not set back water to the damage of the plaintiffs' mills, or otherwise injure such mills, then the defendant's intestate had a right to maintain a dam at that height; and if the jury find that the present dam of the defendant is at no greater height than the old fulling-mill dam with its permanent boarding, then the defendant's intestate had a right so to maintain the present dam under the appropriation made by the erection of the old fulling-mill dam to that height. But the judge declined so to rule.

The jury, after a deliberation of several hours, returned into court, and, in answer to the inquiry by the clerk, whether they had agreed on a verdict, the foreman replied, "Yes," and handed to the clerk a paper, on which was the following, signed by the foreman : "The jury find for the plaintiffs, and assess damages in the sum of one dollar. The defendant shall reduce his dam to a level with the crest of the old tannery dam." The clerk passed this paper to the judge, who stated to the foreman that the jury had no authority to return a verdict in that form, and directed him to erase in the verdict the following words : "The defendant shall reduce his dam to a level with the crest of the old tannery dam." The clerk then read to the jury the verdict as it was after this erasure, and, by the direction of the judge, inquired of the jurors if the verdict as read was their verdict; only three or four of the jurors assented, the others dissenting therefrom. The judge then stated to the jury that, as it appeared that they had not agreed on a verdict, they would retire for further consultation, which they did, the judge giving directions that, if they agreed, they might seal up their verdict and return it in the morning. The counsel of both parties were present and neither assented nor excepted to the order of the judge. The jury, after a further deliberation of several hours, agreed, and the next morning returned a sealed verdict for the plaintiffs, with damages assessed at $862.83, which verdict was duly affirmed by them and rendered. After the return of the jury into court the next morning, the counsel of the defendant, prior to the opening of the verdict, objected to the reception of any verdict, and reserved his right of exception to the same being received and affirmed.

The defendant alleged exceptions to so much of the charge to the jury as related to the right of the plaintiffs to have the water discharged from their premises into the river below; to so much thereof as related to the causing of the alleged damage partly by the acts of the defendant's intestate, and partly by other causes; to the refusals to rule as requested; and to the orders as to the verdict.

*T. P. Pingree & J. M. Barker,* (*F. O. Sayles* with them,) for the defendant. 1. The case falls within the general rule that actions of tort do not survive. *Holmes* v. *Moore,* 5 Pick. 257. The exception contained in the Gen. Sts. *c.* 127, § 1, that actions "for damage done to real or personal estate" shall survive, does not cover the case at bar. The exception was intended to include only those cases where injury is occasioned to property by the direct wrongful act of the party, and not where it results incidentally or collaterally therefrom. *Cutting* v. *Tower,* 14 Gray, 183. There was no evidence that the defendant's intestate, during the time complained of in this action, did any act whatever to his dam or waterworks, except to use them as constructed in 1860. The action does not claim damages for the original building of the dam, which was the only direct act of the intestate; and whatever damages may have resulted to the plaintiffs from the use of this dam during the six years prior to September 1, 1872, were mere incidental or collateral results only, and therefore not recoverable against the administrator.

2. The instruction requested by the defendant, that if the backwater on the plaintiffs' wheels was caused in part by the wrongful acts of the defendant's intestate and in part by the lowering of the plaintiffs' wheels and the narrowness of their archway, they had contributed to the injury, and could not recover, should have been given; and the exception to the refusal of the court to give this instruction, and to that part of the charge which laid down a different doctrine, must be sustained. The use by the plaintiffs of an archway so narrow as to set back water on their own wheels, and the lowering of their wheels, were contributory acts of negligence by the plaintiffs, which caused, in part, the injury and loss of power. Shearman & Redfield on Negligence, (3d ed.) §§ 1, 2, 25, 33, 34, 42, and cases cited.

A jury cannot justly measure or estimate the contribution to the loss of power, and the damage resulting therefrom, which in the nature of the case is indivisible and unascertainable by reason of the mingling of the water, set back to its level from the defendant's dam, and that retarded by the too narrow archway, with that in the depressed wheel-pits of the plaintiffs' mills. Nor can a jury reasonably compare the present with the power and capacity enjoyed by the former mills of the plaintiffs, which, with their dams, wheel-pits and wheels, for twenty-five years prior to the plaintiffs' action, had been removed, without inquiring into an infinite variety of matters, involving legal, scientific mathematical and problematical considerations of varied rights and interests. Because of the futility of such attempts, the common rule in cases of contributory negligence has been sustained and should prevail.

3. The defendant's exception to that part of the charge relating to the right of the plaintiffs to have the water discharged from their premises into the river below, must be sustained. The statement that "the lower proprietor of a mill may maintain a dam, or raise it, so as to use all the unappropriated water-power of the stream;" and that "after each party has made an appropriation of the water-power he is entitled to, neither can make any changes which shall injuriously affect the right of the other;" are incorrect statements of the law. A change which injuriously affected the mill of the other would not injuriously affect his right. That could only be injuriously affected by twenty years' adverse user of the change; and the instruction fails to give the jury a rule to guide them, as to the legal effect of a lowering of the upper wheels and race, which would, of course, not injuriously affect either the right or the mill of the owner below, and from which, therefore, the jury might find that the plaintiffs, by so lowering, had made a lawful appropriation. So, too, that portion of the charge which discusses the right of the plaintiffs to have the water discharge from their premises into the river below, as modified by the right of the defendant's intestate to dam it back or obstruct it, clearly limits the right of the defendant's intestate to such as he may have obtained by adverse use for twenty years, being entirely silent as to any right which he might gain by a lawful appropriation of unoccu-

pied power, without adverse use for twenty years.   The portion of the charge excepted to was, therefore, erroneous in stating incorrectly an abstract proposition of law, and in stating adverse possession for twenty years to be the only mode in which the defendant's intestate could gain a right to interfere with the passage of the water from his premises into the river below, when it should have been stated in this connection that the appropriation by the intestate of unoccupied fall, without damage to the plaintiffs' mills, would also give that right, and this legal principle should have been applied to the evidence as fully as the other.

4.  The instruction requested by the defendant before the jury retired should have been given.   It was correct in point of law, and there was evidence to which it was applicable and appropriate.   The evidence as to the erection of the old fulling-mill dam was specially commented upon by the judge in connection with the law as to gaining of rights by adverse possession, in such a manner that the jury would reasonably infer from it, in the absence of such further instructions as were asked by the defendant, that, unless the right to maintain the fulling-mill dam had been gained by twenty years' adverse use, it did not exist.   The attention of the jury was not sufficiently called to the point, that if the erection of the old fulling-mill dam did not in any way injure the mill above as then existing, its erection was a lawful appropriation of unoccupied power, and gave the defendant's intestate the right to maintain a dam at that height, even if such dam had been claimed to be a nuisance and interfered with by the plaintiffs, so that on the ground of adverse possession alone, the defendant would not have gained the right to maintain it.   The court having singled out this portion of the evidence for special comment and remark in one aspect of the case, should also have further instructed the jury as to the effect of other rules of law upon the same portion of the evidence, when so requested.

5.  The verdict should be set aside for irregularity.   In the case at bar the jury had made up and signed their verdict and had delivered it to the clerk, who had made it known to the judge ; the judge then caused the clerk to amend this written verdict, and to read the same to the jury.   The result of all

this was to give the jury the impression that they must render some verdict for the plaintiffs. This course was not only irregular, but to receive a second verdict afterwards was highly prejudicial to the defendant. *Clark* v. *Lamb*, 6 Pick. 512. *Jones* v. *Kennedy*, 11 Pick. 125. *Coffin* v. *Jones*, 11 Pick. 45. *Walker* v. *Dewing*, 8 Pick. 520. *Commonwealth* v. *Judd*, 2 Mass. 329, 334. *Chaffee* v. *Pease*, 10 Allen, 537. *Warner* v. *New York Central Railroad*, 52 N. Y. 437. The regular course would have been to have received and recorded the whole paper, handed in by the jury as their verdict, and afterward, on motion of either party, to have struck out from it any part not warranted by the circumstances of the case. This course would have left the verdict in favor of the plaintiffs for only $1, and all the steps subsequent to the reporting of the original verdict were irregular.

*H. L. Dawes & M. Wilcox*, for the plaintiffs.

COLT, J. The defendant's intestate erected the dam complained of, and, during the time covered by the declaration, maintained the same. The plaintiffs claim damage for injury to their mills caused by the backwater of this dam. It is objected that the cause of action does not survive against the administrator. But the statute exception to the general rule by which actions of tort are held not to survive embraces in its terms actions for damage done to real or personal estate by the wrongful act of a party. Gen. Sts. *c*. 127, § 1. Upon the allegations here made, the real estate and mills of the plaintiffs are diminished in value and their use impaired, as the direct and natural consequence of the wrongful act of the defendant's intestate in maintaining his dam at such a height as to obstruct the flow of water. It is for injury to this specific property that damages are sought to be recovered, and the case is within the exception of the statute. *Cutting* v. *Tower*, 14 Gray, 183. *Norton* v. *Sewall*, 106 Mass. 143. The owner of real estate is liable as well for maintaining as for creating a nuisance thereon.

There was evidence at the trial, tending to show that the backwater complained of was in part caused by the lowering of the plaintiffs' wheel-pit, and in part by the narrowness of the archway through which the water from their wheels was discharged. This evidence did not call for or justify the instruction requested

by the defendant upon this point. The doctrine of contributory negligence, as applied in actions to recover for an act of mere negligence on the part of the defendant, has no application to the facts here presented. The jury were told that if they found that the backwater was caused in part by the dam and in part by the causes above referred to, then the defendant would be liable for such part of the damage as was caused by the dam only ; such part as they " were satisfied arose from the wrongful acts of the defendant's intestate, and not from any other cause." Towards the injury thus defined and limited, the plaintiffs' acts, in lowering their wheel-pit and using an insufficient discharge, in no sense contributed. The fact that the plaintiffs do not make the most skilful and efficient use of their mill privilege does not give the right to diminish their power by additional backwater. *Clarke* v. *French*, 122 Mass. 419. The difficulty in estimating the loss of power, thus chargeable to the act of the defendant's intestate, is no greater than must arise in many like cases which are submitted to the jury without question.

We see no valid objection to that portion of the charge of the judge, which related to the right of the plaintiffs to have the water discharged from their premises into the river below, which is now fairly open to the defendant. It was contended at the trial, by the defendant himself, that the dam of his intestate was erected on one of the natural channels of the Hoosac River, which divided at a point above the plaintiffs' mill, and formed an island, on which the mill of the defendant's intestate was situated ; that the plaintiffs' mills discharged the water into this natural stream on their own land ; and that the rights of both parties were to be construed and determined accordingly. The defendant cannot now complain that the case was tried upon his own theory. There was no occasion for an application of the rule that, when a right to a raceway over the land of another is obtained solely by deed which fails to define the extent of the grant, then the appropriation which is first made under the deed must govern. If the defendant desired special instructions in this direction, the attention of the judge should have been called to it. It is manifest that the rule, as applied to this case, would have required qualification, in view of the prescriptive rights claimed by both parties.

The rights of riparian proprietors to the use of running water appropriated for mill purposes were fully stated by the judge, and stated with sufficient accuracy. The jury were told that the lower proprietor may maintain a dam so as to use all the unappropriated water-power, and may cause the water of his pond to set back into the raceway of the mill above, provided it does not obstruct the upper mill-owner's wheel, and that, "after each party has made an appropriation of the water-power he is enti· tled to, neither can make any changes which shall injuriously affect the rights of the other."

The jury could not have understood from this, that the mere act of lowering the upper mill and raceway, after the defendant's rights were acquired, would constitute an appropriation of additional power in favor of the plaintiffs. The rights which either party might acquire by prescription, in derogation of the rights of the other, were discussed and correctly stated in another part of the judge's charge. And the statement that neither party " could make changes which should affect the rights of the other " had reference to rights acquired by occupancy, and not to those which had been otherwise acquired. The jury must have understood and correctly applied the evidence to the two modes in which the rights of the parties could have been legally acquired.

The instruction requested after the charge and before the jury retired was properly refused. It does not follow that the defendant would not be liable, if the jury should find that a previous dam, with its permanent boarding, did not set back water to the damage of the plaintiffs' mills, and that the present dam is of the same height. The plaintiffs may have acquired prescriptive rights as against the old dam and its permanent boarding, so that the height of the old dam would not now measure the plaintiffs' rights. And, besides, the whole matter was fully covered by the instructions which the judge had already given.

There was· no irregularity in the proceedings had in court with reference to the verdict. The only verdict on which the jury agreed was accepted and recorded by the court. The paper which, on first coming into court, the foreman handed to the clerk, when asked if the jury had agreed, contained matter entirely foreign to the issue, which, under the direction of the

court, was properly erased. But the jury, when asked by the clerk, did not assent to the amended paper as their verdict, and it could not, therefore, be recorded in any form as such. It only remained for the judge to send the jury out for further consultation, and to accept their verdict afterwards rendered, which was correctly responsive to the issue tried, and was duly affirmed in court.

A jury may be sent out again by the court when their verdict does not pass upon the whole matter submitted to them, even if they separated after agreeing upon and sealing up their first verdict, before they came into court. *Pritchard* v. *Hennessey,* 1 Gray, 294. *Commonwealth* v. *Carrington,* 116 Mass. 37, 39. And, before a verdict is recorded, the jury may be required to reconsider it, if it appears to be a mistake, and may be sent out for that purpose. *Root* v. *Sherwood,* 6 Johns. 68. *Blackley* v. *Sheldon,* 7 Johns. 32. *Goodwin* v. *Appleton,* 22 Maine, 453. *Warner* v. *New York Central Railroad,* 52 N. Y. 437.

We cannot see that the proceedings of the court had any tendency to give the jury the impression that they were bound to give a verdict for substantial damages against the defendant, or to prejudice him in that direction. The more natural inference from the whole proceeding would be, that the judge was satisfied with a verdict for nominal damages only. It is enough that on more careful consideration they were able to agree on the verdict which was returned and accepted.

*Exceptions overruled.*